IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION



CYNTHIA CAGLE, as personal )
representative of the Estate )
of Danny Ray Butler, deceased, )  CIVIL ACTION NO.
etc.                           )
                               )  00-AR-2679-J
    Plaintiff,                )
                               )
v.                             )
                               )
WINSTON COUNTY, et al.,        )
                               )
    Defendants.               )

**ENTERED**

**MAY  1 2002**

### MEMORANDUM OPINION

Before this court are three motions for summary judgment in this action filed by Cynthia Cagle invoking 42 U.S.C. § 1983 as a result of the suicide of her brother, Danny Ray Butler ("Butler"), a pre-trial detainee at the Winston County Jail. One motion was filed by defendants, Winston County ("County") and the Winston County Commission ("Commission"); one motion was filed by defendants, Sheriff David Sutherland[1] ("Sutherland") and Chief Deputy Don Wright ("Wright"); and one motion was filed by defendants, Deputy Sheriff Brian Kirkpatrick ("Kirkpatrick") and jailer Alan Cole ("Cole"). The three motions cover all six defendants.

---

[1] David Sutherland was Sheriff of Winston County when Butler committed suicide, but has since left office following Sutherland's guilty plea to a charge of trading votes for money, alcohol and protection of moonshiners from Alabama Alcohol Beverage Control agents.



**Undisputed Facts**

With a few exceptions, the parties agree on what happened up until the last thirty minutes of Butler's life. On September 23, 1998, Kirkpatrick, reserve deputy James Wright and State Trooper Max Holt ("Holt") responded to a call that Danny Ray Butler was armed with a gun and headed towards the Bridgeman residence intending to kill Mr. Bridgeman. They arrived to find Butler sitting in his car in the Bridgeman driveway. Because Butler was drunk, Holt arrested him for DUI. No gun was found on Butler or in his car.

While Kirkpatrick drove Butler to the jail, Butler told Kirkpatrick that his significant other had just hung herself in the Carbon Hill jail and that if Butler had to spend that night in jail, he too would commit suicide. Because of these threats, Kirkpatrick and Holt confined Butler alone in cell number one, the only cell that can be monitored by video camera, from which trustys acting at their direction removed razors, bed sheets and any other implements they suspected Butler could use to harm himself. Before leaving Butler in the cell, Kirkpatrick and Holt removed Butler's shoelaces and belt and directed the inmates in the cell adjacent to cell number one to "keep an eye" on Butler. It is impossible to see into cell number one from any other cell, except through a small hole in the wall separating cell number one from the adjacent cell. Butler asked at what time the next

day he could "bond out".  Most, but not all, of cell number one can be viewed through the video camera.

During the night, inmates in the other cell spoke to Butler and even passed him a lit cigarette through the hole in the wall separating the cells.  Cole made a jail check at 9:00 p.m. which he recorded in the jail log and during which everything seemed fine.  At 10:46 p.m., Cole discovered Butler hanging from a noose improvised from the elastic in Butler's underwear.  Cole logged this check.  Cole immediately radioed for help, and, as soon as the other officers returned to the jailhouse, they entered cell number one and cut down Butler's lifeless but warm corpse.  Cole did not enter the cell immediately because the Sheriff enforced a policy that prohibited a jailer from entering the cell of a suspected suicide victim unless the jailer was accompanied by another jailer or law enforcement officer.  This policy was designed to protect a lone jailer from an inmate who had feigned suicide in order to overpower the guard and escape.

**Disputed Facts**

One fact on which the parties do not agree is whether Cole made an additional jail check sometime between 10:00 p.m. and 10:30 p.m.  Cole testifies that he made such a check, but did not record it in the log.  The log reflects no checks between 9:00 p.m. and 10:46 p.m.  Billy Whitworth ("Whitworth"), an inmate in

3

the jail that night, testified that Cole made no such check.  For purposes of deciding a motion for summary judgment, all disputes of fact must be resolved in favor of the non-moving party, here Cagle.  Cagle has put before this court evidence of Whitworth's testimony and the jail log that shows no entry for the putative jail check.  *See* F.R.E. 803(7).  Therefore, this court must assume, at this juncture, that Cole did not make this unrecorded jail check.

Also in dispute is whether Cole was directed by his superiors to check on inmates at least once an hour or once every two hours and whether Cole knew that Butler was suicidal. Wright, who trained Cole, testified that he told Cole to check the jail at least once an hour.  (Wright Depo. at 76).  Cole testified that he had been trained to check the jail once every two hours.  (Cole Depo. at 43).  Cole claims that Kirkpatrick did not tell him that Butler was suicidal, only that Kirkpatrick directed him to "keep an eye" on Butler.  Cole does admit, though, to knowing that Kirkpatrick removed Butler's belt, shoelaces, bedclothes, razors and all other known potential suicide implements from Butler's cell.  A reasonable finder of fact could infer from this knowledge that Cole knew that Butler was a suicide risk, severe enough to warrant these actions.  For summary judgment purposes, this court will act as though Cole had been ordered to check the jail once an hour and that Cole knew

4

Butler was a suicide risk.

*Praytor* **Order**

Lurking in the shadows is the so-called *Praytor* order, which represents the final settlement of the action *Jimmy Lee Praytor, et. al. v. Elton Cotton Townsend*, CV-80-HM-250-S, entered by Judge E.B. Halton of this court on June 8, 1984. This order requires this particular jail to be staffed with two jailers from 5:00 p.m. to 8:00 a.m. There is no evidence that any of the instant defendants knew of the *Praytor* order until this litigation. In fact, all defendants deny such knowledge. Nevertheless, paragraph twenty-five of the *Praytor* order reads:

> The terms and provisions hereof shall be binding upon and enforceable against all named defendant public officials in this litigation and their respective successors in office who shall upon succession be automatically substituted as party defendants herein in their respective official capacities. This portion of the within order shall have both retrospective and prospective effect.

The named defendants subject to the *Praytor* order were the Sheriff and the County Commissioners. Whether they knew of it or not, Sheriff Sutherland and the County Commissioners were subject to this order and have constructive, if not actual, notice of it. The County and the Commission argue that, because it was old and unknown to the defendants, "the case was considered, for all practical purposes, closed." (Winston County and the Winston

5

County Commission's BR. in Supp. of Mot. for Summ. J. at 3).  For legal purposes, however, the case is still very much open.  Paragraph twenty-six of the order provides that this court shall retain jurisdiction over the case to issue orders and decrees necessary to secure enforcement, so the current County Commissioners and Sheriff are bound by the order.

**Analysis**

   Defendants have cited various reasons in their briefs why, even if a legal wrong has been committed, none of them are liable.  Before reaching these questions, this court will first decide whether Cagle has amassed enough evidence so that a reasonable finder of fact could find the three elements of deliberate indifference.

   Because Butler was a pre-trial detainee, and not an incarcerated convict, Cagle's claim is analyzed under the Fourteenth Amendment Due Process clause and not the Eighth Amendment Cruel and Unusual Punishment clause.  "[I]n a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under either the eighth or fourteenth amendment, the plaintiff must show that the jail official displayed deliberate indifference to the prisoner's taking of his own life."  *Tittle v. Jefferson County Commission*, 10 F. 3d 1535, 1539 (11th. Cir. 1994)(internal citation and punctuation

omitted).  In order to be deliberately indifferent, a defendant must have "(1) subjective knowledge of a risk of serious harm; [and] (2) disregard [] that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F. 3d 1248, 1255 (11th. Cir. 1999).   The "more than mere negligence" standard has been likened to recklessness.  "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer v. Brennan*, 511 U.S. 825, 836 (1970).

There is little question but that a reasonable finder of fact could find that Kirkpatrick had a subjective knowledge of the risk of serious harm.  Kirkpatrick acknowledges that Butler arrived at the jail as a potential suicide risk.  He thought the risk serious enough to direct trustys to remove from Butler's cell anything that might be used as an instrument of suicide and to remove from Butler's person his shoelaces and belt. Kirkpatrick knew of the risk.  And as noted earlier, for purposes of this motion for summary judgment, this court assumes that Cole knew of the risk.

Sutherland's requests for an additional jailer, and the binding effect of the *Praytor* order, are enough to allow a finder of fact to conclude that the County, the Commission, and Sutherland knew of the risk.  Wright is being sued based upon his

role in the training of Cole and because he did not promulgate an effective anti-suicide policy. Sutherland, not Wright, is the Sheriff. Under Alabama law, the Sheriff is the policy maker, so Wright cannot be liable for policies complained of by Cagle. Because he played no part in the actual booking or detention of Butler, Wright personally committed no acts of deliberate indifference to Butler. "[A] finding of deliberate indifference requires that officials have notice of the suicidal tendency of *the* individual whose rights are at issue." *Tittle* at 1539. (emphasis in original). Therefore, Wright's motion for summary judgment is due to be granted.

The actions that show Kirkpatrick and Cole knew of the risk may also show that Kirkpatrick and Cole regarded the risk. While Kirkpatrick and Cole did take some measures to prevent Butler from harming himself, they did not do enough. Butler did kill himself. This court will consider elements two and three together. Was this disregard of the risk, if any, so grave as to rise to the level of "more than mere negligence?"

According to Cagles's expert, Roger Childers, self-strangulation with the elastic from one's own underwear is extremely rare. (Childer's Depo. at 103) Indeed, Butler's death is the first time that Childers has seen this particular method of suicide. There are two ways that the various defendants could have prevented Butler from even trying to kill himself in this

8

manner. The first is to remove all of his clothing, including his underwear, and dress him in a paper gown. The second is to place Butler under frequent, at least every fifteen minutes, or constant, supervision by either a jailer or a trusty, and have had at least one more jailer at the jail so that if Butler did try to kill himself, a jailer could have immediately entered the cell to save Butler from himself. Not choosing the first option may have been negligence, but it was not "more than mere negligence."

This court will next consider whether the decision to check on Cagle in person no more frequently than once every two hours and rely on video monitoring in between these checks was more than "mere negligence." Defendant's own expert has testified that a suicidal inmate should be in a cell with a trusty and checked on by a jailer at least every fifteen minutes. (Black Depo. at 95-96). Furthermore, *Praytor* ordered that the jail be checked every hour. A reasonable jury could find that Black's recommendations are the standard of care, that the various defendants did not meet that standard, and that even though they took some preventative actions, the failure was by a margin large enough to constitute more than mere negligence. *See Jacobs v. West Feliciana Sheriff's Dept.*, 228 F.3d 388 (5th Cir. 2000)(holding that even though Sheriff withheld bedding for first day and a half of detention and checked on inmate once every

forty-five minutes, he could be found deliberately indifferent). Finally, in a claim against Cole only, a reasonable finder of fact could conclude that he could have cut Butler down immediately upon discovering him while still complying with the Sheriff's prohibition against entering Butler's cell alone by enlisting a trusty. A reasonable finder of fact could conclude that because Butler's body was warm when it was eventually cut down, he might have died after Cole first saw him hanging. A finder of fact could determine that this wait was enough to constitute more than mere negligence.

Accordingly, a reasonable finder of fact could find that Cagle has met all three elements and therefore a legal wrong has occurred. Because defendants, except Wright, cannot get summary judgment based upon their argument that no legal wrong has occurred, summary judgment now stands or falls based on their arguments that even if a legal wrong has occurred, they are not liable. At this point in the saga, the remaining fellowship of five will disperse into two pairs and one Sheriff, and this court will consider each of their arguments separately.

**Winston County & the Winston County Commission**

In Alabama, a sheriff, and his subordinates, are agents of the state, not the county in which they work. As such, the County and the Commission cannot be held liable for the torts of

the sheriff and his subordinates. Cagle is proceeding against them, though, not on a basis of holding these defendants accountable for the negligence of the Sheriff and his underlings, but rather on a theory that the County and the Commission themselves committed a tortuous act by breaching their duty, imposed both by the *Praytor* order and the ordinary duty of care, to staff the jail with more than one nighttime jailer. A county may be held liable for a constitutional deprivation only if the county had "a policy or custom that caused the deprivation." *Vinson v. Clarke County, Ala*, 10 F. Supp. 2d 1282, 1294 (S.D. Ala. 1998). In order to survive summary judgment by these defendants, Cagle must amass evidence to show that the County and the Commission had a policy and that this policy caused the deprivation at issue.

"Counties may be liable for violations of Constitutional rights only when such violations occur as a result of an official county policy." *Tittle v. Jefferson County*, 10 F. 3d 1535, 1540 (11th. Cir. 1994)(citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978). Cagle has shown that, in spite of two requests by Sheriff Sutherland, and in spite of *Praytor*, the Commission operated the jail with only one jailer at night, and that this was a policy established by the County and the Commissioners. Arguments that the County would have preferred to hire a second jailer but did not because it did not have enough

11

money are unavailing.  A budget crunch, even one so severe that it caused a county commissioner to pay for office supplies out of his own pocket, is no excuse for violating a perspicuous order from this court.  "Shortage of funds is not a justification for continuing to deny citizens their constitutional rights."  *Gates v. Collier*, 501 F. 2d 1291, 1320 (5th Cir. 1974).  Nor is a shortage of funds a justification for disobeying a lawful order of this court.  This court would never tell the County how it should pay for a second jailer, only that it must.

A second jailer could have observed Butler frequently or continuously, which may have prevented Butler from even trying to commit suicide.  At the very least, the presence of a second jailer would have allowed Cole to enter Butler's cell a few minutes sooner, during which time Cole might have revived Butler.  (Koson Depo. at 145).  Because a reasonable finder of fact could, based upon the evidence before this court, conclude that the Commission had a policy of under-staffing the jail, and that this policy was a proximate cause of Butler's suicide, the Commission's motion for summary judgment is due to be denied.

Finally, Winston County argues that the use of a lone dispatcher/jailer, like Cole, is fairly common.  Presumably, this statement was made to advance the theory that because it is a common practice, it is a reasonable practice.

> In most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole

12

> calling may have unduly lagged in the adoption of new
> and available devices. It never may set its own tests,
> however persuasive be its usages. Courts must in the
> end say what is required; there are precautions so
> imperative that even their universal disregard will not
> excuse their omission.

*The T.J. Hooper*, 60 F. 2d 737 (2nd Cir. 1932). Even if the County's statement regarding the commonality of employing only one jailer is true, the universal disregard of the need for more than one jailer in Alabama jails, at least in this Alabama jail, does not render it reasonable.

**Sheriff Sutherland and Chief Deputy Wright**

As mentioned above, an Alabama sheriff, and his subordinates, are agents of the state. Therefore, they enjoy immunity under the Eleventh Amendment to the United States Constitution from actions filed against them in their official capacity. The Eleventh Amendment does not protect Sutherland from being sued in his personal capacity, as he has been here. He does have the defense of qualified immunity, which is available to a defendant if he acted within his discretionary authority and no clearly established law prohibited his actions. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory

13

or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald* (457 U.S. 800, 818 1982). The Eleventh Circuit determines qualified immunity via a two pronged test.

> 1. The defendant public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.
> 2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law.

*Rich v. Dollar,* 841 F. 2d 1558, 1563-64 (11th. Cir. 1988). "[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Jordan v. Doe*, 38 F. 3d 1559, 1565 (11th Cir. 1994). All of the actions taken, or not taken, by Sutherland were of the sort that would compel the conclusion that he acted within the scope of his authority as Sheriff.

The burden now shifts to Cagle, to prove that Sutherland violated clearly established law. Cagle can meet that burden. Paragraph seven of the *Praytor* order requires two jailers in the evening hours and a logged jail check once an hour. Paragraph

twenty-five of the order binds all successors to the named defendants, which includes the Sheriff.  Therefore, clear law exists as to Sutherland.  Sutherland's breach is different from the County's in that the County breached its duty to hire a second jailer, whereas Sutherland, through Wright, directed Cole to inspect the jail only once every two hours.

To the extent that Cagle seeks to recover against Sutherland because Cole was the lone jailer and did not check on Butler once an hour, Sutherland is stripped of his qualified immunity, and must face Cagle.  To the extent that Cagle seeks to recover against Sutherland due to improper training or any other deficiency not covered by the *Praytor* order, Sutherland is still cloaked by qualified immunity.  With this caveat, the motion of Sutherland is due to be denied as stated, it is due to be granted as to Wright.

**Cole & Kirkpatrick**

Both Cole and Kirkpatrick claim qualified immunity.  Both acted within their discretionary authority.  Cole, who is not a deputy sheriff, took actions consistent with his job as a jailer. Kirkpatrick acted in accordance with his job as a Sheriff's Deputy.  Qualified immunity, then, turns on whether Cole and/or Kirkpatrick violated clear law.  Cole, as the jailer, and as an employee and agent of the Sheriff, was under the *Praytor* order

15

and thus obligated to check on all prisoners at least once an hour. This he did not do. Cole's inaction violated clear law, stripping him of qualified immunity. Kirkpatrick's conduct does not implicate *Praytor*. Indeed, the most he is charged with is not perspicuously informing Cole of Butler's suicidal propensities. When such purported non-communication is considered in light of Kirkpatrick's cell-clearing, it is not in violation of any clear law and therefore is qualifiedly immune.

It is probably true that in the Eleventh Circuit,[o]nly the rare [prisoner suicide] case has survived summary judgment. *Holland v. City of Atmore*, 168 F. Supp. 2d 1303, 1313 n.10. This is no doubt due to the inability of the plaintiff to find a clear law violated by the defendant and their resulting inability to strip the defendants of their qualified immunity. Rarer still is a court order that defines the clear law applicable to future circumstances. In this case, however, plaintiff has such an order, and is able to defeat all of the qualified immunity claims, except that of Kirkpatrick.

The court will enter a separate order, consistent with this opinion.

DONE this ___1st___ day of May, 2002.

_[signature]_
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE